**FILED**
10/18/2023
THOMAS G. BRUTON
CLERK, U.S. DISTRICT COURT

AO 91 (Rev. 11/11) Criminal Complaint                        AUSA Anne L. Yonover (312) 886-2038

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

UNITED STATES OF AMERICA

v.

WILLIE B. ROBINSON III

CASE NUMBER 23 CR 553

## CRIMINAL COMPLAINT

I, the complainant in this case, state that the following is true to the best of my knowledge and belief. On or about October 10, 2023, at Chicago, in the Northern District of Illinois, Eastern Division, the defendant violated:

| Code Section | Offense Description |
|---|---|
| Title 21, United States Code, Section 841(a)(1) | The defendant did knowingly and intentionally possess with intent to distribute a controlled substance, namely, a quantity of a mixture and substance containing a detectable amount of Methylenedioxymethamphetamine, a Schedule I Controlled Substance |
| Title 21, United States Code, Section 846 | The defendant attempted or conspired to possess with intent to distribute and conspired to distribute a controlled substance, namely, a quantity of a mixture and substance containing a detectable amount of Methylenedioxymethamphetamine, a Schedule I Controlled Substance |

This criminal complaint is based upon these facts:

 X   Continued on the attached sheet.

STEPHEN TOVT
Special Agent, Drug Enforcement Administration (DEA)

Pursuant to Fed. R. Crim. P. 4.1, this Complaint is presented by reliable electronic means. The above-named agent provided a sworn statement attesting to the truth of the Complaint and Affidavit by telephone.

Date: October 18, 2023

_Judge's signature_

City and state: Chicago, Illinois

MARIA VALDEZ, U.S. Magistrate Judge
_Printed name and title_

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF ILLINOIS

## AFFIDAVIT

I, STEPHEN TOVT, being duly sworn, state as follows:

1.     I am a Special Agent with the Drug Enforcement Administration ("DEA"), and I have been employed with the DEA since approximately January 2022. My current responsibilities include the investigation of narcotics trafficking offenses.

2.     This affidavit is submitted in support of a criminal complaint alleging that WILLIE B. ROBINSON III ("ROBINSON") has violated Title 21, United States Code, Section 841(a)(1) and Title 21, United States Code, Section 846. Because this affidavit is being submitted for the limited purpose of establishing probable cause in support of a criminal complaint charging ROBINSON with possession with intent to distribute a quantity of a mixture and substance containing a detectable amount of Methylenedioxymethamphetamine ("MDMA"), a Schedule I Controlled Substance, and with conspiring with Nathaniel Lee Butler-Ludwig[1] to possess with intent to distribute and to distribute a controlled substance, namely, a quantity of a mixture and substance containing a detectable amount of Methylenedioxymethamphetamine, a Schedule I Controlled Substance, in violation of Title 21, United States Code, Section 841(a)(1), all in violation of Title 21, United States Code, Section 846, I have

---

[1] Butler-Ludwig was charged by criminal complaint on October 11, 2023 in case number 23 CR 537 with possession with intent to distribute a controlled substance, namely, a quantity of a mixture and substance containing a detectable amount of Methylenedioxymethamphetamine, a Schedule I Controlled Substance.

not included each and every fact known to me concerning this investigation. I have set forth only the facts that I believe are necessary to establish probable cause to believe that ROBINSON committed the offenses alleged in the complaint.

3. This affidavit is based on, among other things: (a) my personal knowledge of the facts and circumstances of the investigation described below; (b) information provided by other law enforcement officers, including written and oral reports that I have received from other law enforcement officers; (c) information obtained from witnesses, including confidential sources working for the DEA or other law enforcement agencies; (d) consensually recorded communications; (e) the results of physical surveillance conducted by law enforcement; and (f) my training and experience and the training and experience of other law enforcement officers involved in this investigation.

## I.   FACTS ESTABLISHING PROBABLE CAUSE

### A.   The Confidential Source and ROBINSON Conduct a Sample Transaction on September 26, 2023.

4. Over the past few weeks, a confidential source[2] ("CS") informed law enforcement officers that a man that the CS referred to as Willie B. Robinson III was

---

[2] The CS has no current charges pending. In April 2023 the CS was approached by law enforcement agents in connection with an ongoing DEA investigation, in which the CS was observed delivering approximately ½ kilogram of methamphetamine. The CS admitted his/her involvement in money laundering and drug trafficking activities, and voluntarily agreed to cooperate with law enforcement. No promises have been made to the CS regarding future criminal charges related to the CS's previous money laundering and drug trafficking activities. The CS has a criminal history that includes various drug convictions and convictions for aggravated kidnaping, and aggravated battery with a weapon. The CS has been required to register on a violent offender youth registry. I deem the information provided by the CS as set forth in this affidavit to be reliable, as it is corroborated in significant respects by independent evidence, including physical surveillance, text message

selling narcotics. The CS provided law enforcement with ROBINSON's phone number, (XXX) XXX-3249 ("Robinson Phone"). Law enforcement officers ran the phone number for ROBINSON through a public records database, which revealed that the phone is associated with ROBINSON.

5.     Thereafter, law enforcement issued an administrative subpoena to T-Mobile. The T-Mobile subpoena return listed ROBINSON as the subscriber and customer associated with the Robinson Phone.

6.     Law enforcement officers then sent an unmarked Illinois Secretary of State photograph of ROBINSON to the CS. The CS confirmed that the man in the photograph was ROBINSON. The CS told law enforcement officers that ROBINSON lived in the top apartment of 2321 N. Kostner Ave, in Chicago, Illinois (the "Robinson Residence").

7.     On or about September 23, 2023, the CS informed law enforcement officers that ROBINSON had contacted the CS through the social media platform Instagram and the CS provided ROBINSON with his/her phone number through Instagram. Thereafter, ROBINSON contacted the CS on his/her cell phone, using the Robinson Phone. After the initial communication on Instagram, the conversations between the CS and ROBINSON occurred by text message and recorded phone calls, that were digitally saved.

---

communications, and the October 10, 2023 seizure of MDMA from Butler-Ludwig. It is further corroborated by information that ROBINSON provided during a post arrest interview on October 17, 2023.

8.  Based on my review of the text messages between ROBINSON and the CS, on September 25, 2023, ROBINSON using the Robinson Phone, sent the CS the following messages:[3]

a.  "Yoo." The CS responded, "What up gang." ROBINSON then stated, "Nm chillin my ppl [people] got hella [a lot of] molly [MDMA] rn [right now] 750-800 a zip [ounce] was seein if u knew n e one who might possibly want some." Based on my training and experience, I understand this message from ROBINSON to mean that he knew someone who had MDMA and that he was looking to sell the MDMA for $750 to $800 an ounce.

b.  The CS then responded, "I can ask bro. what color? It's clean or it has any meth to it? Some of my people been asking for that lately. The meth." Based on my training and experience, I understand the CS to have been asking ROBINSON whether the MDMA had any methamphetamine in it. Methamphetamine is a Schedule II Substance.

c.  In response ROBINSON stated, "lol idk bout that all mdma has meth in it tho because that's what the ma stands for they take sass n ad meth to make

---

[3] This investigation included the use of consensually recorded phone calls and text messages. The summaries of recorded conversations in this affidavit do not include reference to all the topics covered during the conversations. Further, quoted material from the recorded conversations as set out in this affidavit is taken from draft summaries, not final transcripts. The summaries do not include references to all statements made by the speakers on the topics that are described by the speakers. At various points in the Affidavit, I have indicated (sometimes in brackets) my interpretation of words and phrases used in the recorded conversations. My interpretations are based on information received from the CS, the contents and context of the recorded conversations, events that took place before and after the conversations, my knowledge of the investigation as a whole, my experience and training, and the experience and training of other law enforcement agents in this investigation.

it mdma but naah this is a1 quality whiteish grey." Based on my training and experience as well as my conversations with the CS, I understood ROBINSON to explain that the MDMA that ROBINSON had access to may contain methamphetamine, and he was explaining to the CS what MDMA is.

        d.      ROBINSON then sent the CS a video recording of the MDMA in his possession. Based on my review of the video, it contained what appeared to be a large, crystal rock, which, based on my training and experience, was consistent with a distribution quantity of MDMA.

        e.      After receiving this video, the CS asked ROBINSON if ROBINSON would provide the CS with a deal if the CS purchased a larger amount of MDMA. ROBINSON responded, "I mean 8 is already cheap how much u thinkin I can give u a bird for 12; or a half for 7; or a 9 for 4." Based on my training and experience and conversations with the CS, I understand this to mean that ROBINSON was willing to sell the CS a kilogram of MDMA for $12,000 (a bird references a kilogram), or half a kilogram for $7,000, or 9 ounces for $4,000.

        9.      Following the conversation between the CS and ROBINSON on September 25, 2023, at the direction of law enforcement, the CS arranged to meet with ROBINSON to obtain a sample of the MDMA. Specifically, the CS arranged to meet ROBINSON at his house to obtain 3.5 grams of MDMA on September 26, 2023. Based on my review of the phone calls between the CS and ROBINSON, on September 25, 2023, at approximately 7:07 p.m., the CS placed a consensually recorded call to ROBINSON and stated, "I'm calling to see if maybe uh is it possible

uh you can front me like a ball of that so I could show for my guy?" Based on my conversations with the CS, "a ball" means approximately 3.5 grams. ROBINSON responded in the affirmative and the CS later said in the conversation, "I for sure wanna come through like if I can tomorrow or Wednesday to get that ball. Does that work with you?" ROBINSON responded, "uhm ya uhm I gotta see how I would go about it, cause I know they got someone in town that I could . . . ."

10.    On September 26, 2023, myself and, other law enforcement officers traveled to the Robinson Residence. At approximately 2:46 p.m., law enforcement officers set up surveillance on the Robinson Residence. At approximately 3:14 p.m., law enforcement officers observed the CS park his/her car behind the Robinson Residence. Prior to traveling to the Robinson Residence, the CS was searched for contraband, and none was found. The CS was equipped with audio and video recording devices.[4]

11.    After the CS arrived at the Robinson Residence, the CS placed a consensually recorded call to ROBINSON and told ROBINSON that the CS was at the Robinson Residence. According to the CS, ROBINSON instructed the CS to go to the back. Shortly thereafter, law enforcement observed the CS enter the Robinson Residence. Based on my review of the audio and video recording device and my conversations with the CS, after the CS entered the Robinson Residence, he/she

---

[4] In a prior complaint submitted on October 11, 2023, in case number 23 CR 537, the affidavit stated that only the audio device that the CS was wearing was working on September 26, 2023. However, the audio recording device and one of the two video recording devices that the CS was wearing were working on September 26, 2023.

observed what appeared to be MDMA on the kitchen counter inside the Robinson Residence. While inside, the CS discussed the purchase of MDMA and inspected the MDMA on the counter. The CS asked ROBINSON what the price would be for half a kilogram of MDMA and for a full kilogram of MDMA. ROBINSON then provided the CS with approximately 3.5 grams of MDMA. After the transaction, law enforcement officers heard the CS exit the Robinson Residence, get into a car, and a law enforcement officer saw the car travel down an alley. Law enforcement maintained surveillance on the CS as he/she traveled to a predetermined location. Upon arriving at that location, the CS provided law enforcement officers with the sample the CS received from ROBINSON. Law enforcement officers field tested the 3.5 grams which tested positive for MDMA. According to lab results, the sample the CS received from ROBINSON came back positive for Methylenedioxymethamphetamine. Law enforcement conducted a search of the CS and found no additional contraband.

**B.    The Confidential Source Sets Up a Subsequent Transaction to Purchase 1 Kilogram of MDMA from ROBINSON.**

12.    Based on my review of text messages and consensually recorded phone calls between the CS and ROBINSON, on October 2, 2023, the CS contacted ROBINSON at the Robinson Phone and informed him that he/she wanted to purchase a kilogram of MDMA. ROBINSON had previously informed the CS that he could provide kilogram quantities of MDMA.

13.    Based on my review of the text messages and consensually recorded calls between the CS and ROBINSON, between the dates of October 2, 2023 and October 9, 2023, the CS and ROBINSON arranged for the sale of a kilogram of MDMA for

7

$13,000. Specifically, the CS and ROBINSON discussed the price of the MDMA and the date for the transaction.

14.     For example, on October 4, 2023, the CS placed a consensually recorded call to ROBINSON. Based on my review of that call, ROBINSON stated, "Nothing much chillin still ain't got no word from dude but one of my homies had grabbed a bunch of them see if they gunna give me one. But it be 13 for sure." The CS then responded, "what's up with other buddies." ROBINSON stated, "they ain't told me shit yet . . . Nothing I can do. Still ain't give me his number." The CS then asked, "is that the dude up in New York?," and ROBINSON responded, "yep." The CS then asked when the supplier in New York was supposed to come back. ROBINSON stated, "I don't know." Based on my training and experience as well as my conversations with the CS, I understood this conversation between the CS and ROBINSON to mean that ROBINSON's supplier was in New York and ROBINSON did not know when he would be back. Additionally, during a consensually recorded call between the CS and ROBINSON, ROBINSON told the CS that his source of supply had forgotten to leave the key fob in Chicago before leaving for New York which would allow the source to access the bulk amount of MDMA that was stored in Chicago.

15.     Based on my review of text messages and consensually recorded calls between the CS and ROBINSON, on October 7, 2023, ROBINSON told the CS that they would have to meet with a courier to receive the kilogram of MDMA in Chicago.

16.     Based on my review of text messages and consensually recorded calls between the CS and ROBINSON, on October 10, 2023, ROBINSON told the CS that

a courier, who was unknown at the time, would be delivering the kilogram of MDMA to ROBINSON's house. ROBINSON told the CS that the courier would be at his house at approximately 7:35 p.m.

17.    Based on my review of text messages and consensually recorded calls between the CS and ROBINSON, on October 10, 2023, at approximately 7:38 p.m., ROBINSON sent a text message to the CS stating, "6 min." The CS responded, "Cool. I am at Taconazo." Based on my understanding of the investigation, and my conversations with the CS, I understand these messages to mean that ROBINSON was waiting for the courier to arrive and that the courier was 6 minutes away.

18.    On October 10, 2023, at approximately 7:42 p.m., law enforcement observed ROBINSON on the front porch of the Robinson Residence and they observed ROBINSON on his cell phone. Law enforcement officers were able to identify ROBINSON as the same person they had seen in the driver's license photo they obtained of ROBINSON.

19.    While law enforcement officers observed ROBINSON on the front porch of the Robinson Residence, at approximately 7:43 p.m., law enforcement officers observed an unknown white male walk towards the Robinson Residence. This unknown white male was later identified as Nathaniel Lee Butler-Ludwig.[5] Law enforcement officers observed Butler-Ludwig exit a suspected rideshare and approach the Robinson Residence. Law enforcement officers then observed Butler-

---

[5] As explained below, later the same evening, law enforcement arrested Butler-Ludwig and recovered photographic identification from him.

Ludwig enter the building where the Robinson Residence is located. Law enforcement officers saw Butler-Ludwig wearing black pants, a black jacket, a black hat, a black backpack, and glasses.

20.     Shortly after Butler-Ludwig entered the building where the Robinson Residence is located, ROBINSON sent the CS the following text messages from the Robinson Phone:

a.     "My boy said he can hop on a video call n show him it's here[;]"

b.     "But he Dnt wanna to go outside n make the move y'all can come inside my boy is a white boy[;]" and

c.     "He's not on no weird shit it's jus not his so he Dnt wanna take no risk[.]

21.     Based on my training and experience, I understand the preceding text messages to mean that: (a) ROBINSON's supplier (Butler-Ludwig) was willing to get on a video call to display the MDMA to the CS's customer to prove the MDMA was at the Robinson Residence; (b) ROBINSON's supplier was a white male who did not want to conduct the MDMA sale outside of the Robinson Residence; and (c) ROBINSON's supplier was not engaging in anything suspicious, but simply did not want to take the risk of leaving the Robinson Residence with the MDMA, because the MDMA did not belong to the supplier (and the supplier would therefore be on the hook for it if the drugs were lost/seized).

22.     After ROBINSON and Butler-Ludwig refused to meet with the CS in person, the CS told ROBINSON that his/her purported customer were backing out of the deal.

23.     Law enforcement officers continued to conduct surveillance on the Robinson Residence. At approximately 8:11 p.m. law enforcement officers observed ROBINSON exit his building empty handed and walk towards the area where he had previously agreed to meet the CS (before Butler-Ludwig apparently refused to conduct the sale outside of the Robinson Residence). Law enforcement did not see Butler-Ludwig exit the building during this time.

24.     At approximately 8:47 p.m. law enforcement officers observed Butler-Ludwig exit the front of the building where the Robinson Residence is located. When Butler-Ludwig exited the Robinson Residence, law enforcement officers observed him with the same black backpack that he had earlier when he arrived at the Robinson Residence. Law enforcement officers saw Butler-Ludwig get into what they believed to be a rideshare vehicle and then leave the area.

25.     Law enforcement officers followed the car that Butler-Ludwig had gotten into to the area of Fullerton Avenue and Western Avenue in Chicago, Illinois. While the car was stopped at a red traffic light, law enforcement observed Butler-Ludwig exit the car and walk towards a bus stop near Fullerton Avenue and Western Avenue in Chicago, Illinois.

26.     At approximately 8:59 p.m., law enforcement officers approached Butler-Ludwig at Fullerton Avenue and Western Avenue in Chicago, Illinois. The law

enforcement officers were wearing fully identifiable police vests and attempted to engage in a consensual encounter with Butler-Ludwig. As law enforcement officers approached Butler-Ludwig, he discarded his black backpack and cell phone, by removing the backpack from his back and dropping it to the ground and dropping the cell phone to the ground. Butler-Ludwig then proceeded to run from the law enforcement officers. The law enforcement officers identified themselves and asked Butler-Ludwig to stop. Butler-Ludwig continued to run. Eventually, the law enforcement officers apprehended Butler-Ludwig on the east side of Western Avenue.

**C.    Law Enforcement Officers Arrested Nathaniel Lee Butler-Ludwig.**

27.    After law enforcement officers caught Butler-Ludwig, they detained him and escorted him towards the vicinity of where he abandoned his black backpack and cell phone. Law enforcement located a second cellphone on the ground where Butler-Ludwig was laying when he was detained by law enforcement.[6] Butler-Ludwig informed the law enforcement officers that he did not want to talk. The law enforcement officers did not locate any identification on Butler-Ludwig's person. The law enforcement officers asked Butler-Ludwig if his wallet would be in the black backpack, to which Butler-Ludwig indicated he did not know.

28.    The law enforcement officers utilized a K9 to perform an air sniff of the area where Butler-Ludwig fled from. The K9 tracked to the black backpack that

---

[6] In a prior complaint submitted on October 11, 2023, in case number 23 CR 537, the affidavit incorrectly stated that following the arrest of Butler-Ludwig, a further search of Butler-Ludwig yielded a second cell phone on his person.

Butler-Ludwig dropped on the ground before he ran from the law enforcement officers and the K9 alerted to the presence of narcotics inside the bag. Based on law enforcement officers observations, they believed that Butler-Ludwig traveled from the Robinson Residence with the kilogram of MDMA that he intended to deliver to ROBINSON in order to complete the sale to the CS. Based on the law enforcement officer's observations, and on their training and experience, they believed that because the transaction with the CS did not occur, Butler-Ludwig left the Robinson Residence with the kilogram of MDMA.

29.     Law enforcement officers searched the black backpack that Butler-Ludwig had dropped on the ground before he ran from the law enforcement officers and they located approximately one kilogram of brown/gray crystal-like substance that was consistent with the appearance of MDMA secured in a clear sandwich bag, which contained two clear plastic vacuum sealed bags. The vacuum sealed bags were inside a United States Postal Service Priority Mail package. The United States Postal Service package was inside a plastic bag, which was inside of the black backpack. The substance inside the vacuum sealed bags appeared to be a brown/gray crystalized substance. Additionally, an unknown amount of U.S. Currency was found in the black backpack.

30.     Law enforcement officers also located a key fob on a key chain with other keys in Butler-Ludwig's backpack. Law enforcement officers believe that the key fob and keys are related to ROBINSON's prior statements to the CS that referenced ROBINSON's source of supply coming from New York with a key fob to access the

bulk amount of MDMA stored in Chicago, Illinois (see paragraph 14 above). Additionally, inside the backpack, law enforcement found a black rain jacket. Inside the front breast pocket, on the inside of the black rain jacket, was a wallet. Law enforcement officers found five cards inside the wallet, including an Illinois Identification Card with the name Nathaniel Lee Butler-Ludwig, with a date of birth of XX/XX/1993, a Blue Cross and Blue Shield insurance card issued to Nathaniel Butler-Ludwig, a Chase debit visa card issued to Nathaniel L. Butler-Ludwig, a Chase Freedom visa card issued to Nathaniel Butler Ludwig, and a Vanilla Visa Gift Card.

31.     During a post-arrest interview, Butler-Ludwig invoked his Miranda rights.

32.     The brown/gray crystalized substance that was recovered from inside the backpack and which was packaged inside vacuum sealed bags was field tested by law enforcement and tested positive for MDMA.

**D.     Law Enforcement Arrested Willie B. Robinson III on October 17, 2023.**

33.     Following the arrest of Butler-Ludwig on October 10, 2023, law enforcement conducted surveillance on the area near the Robinson Residence in an attempt to locate ROBINSON.

34.     On October 17, 2023, at approximately 9:00 a.m., law enforcement setup physical surveillance in the area of the Robinson Residence.

35.     At approximately 12:27 p.m., law enforcement observed a black 2019 Chevrolet Malibu bearing Illinois license plate CS32806, which is registered to

ROBINSON, at 2321 N. Kostner, APT 2, Chicago, Illinois, traveling south bound in an alley behind the Robinson Residence. Shortly thereafter, law enforcement observed the Chevrolet Malibu stop near an opened garage, which was located behind the Robinson Residence. Once the car had stopped, law enforcement approached and parked near the Chevrolet Malibu and observed ROBINSON in the driver seat of the Chevrolet Malibu.

36.     At approximately 12:29 p.m., law enforcement officers exited their vehicles and made contact with ROBINSON. For officer safety, ROBINSON was handcuffed and searched for weapons. Law enforcement asked if ROBINSON had any drugs or weapons inside the Chevrolet Malibu to which he indicated he did not and gave verbal consent to search the Chevrolet Malibu.

37.     Law enforcement officers searched the Chevrolet Malibu and inside the trunk they located a multicolored backpack containing an opened, clear, self-sealing plastic bag containing approximately 47 grams of Psilocybin mushrooms. Additionally, law enforcement found a clear knotted plastic bag containing approximately 15 grams of a brown/gray crystalline substance, which later tested positive for the presence of MDMA, hidden inside the gas compartment of the Chevrolet Malibu.

38.     At approximately 1:13 p.m., ROBINSON agreed to cooperate with law enforcement and ROBINSON provided written consent to law enforcement officers to search the Robinson Residence and to search his cellphone. The Chevrolet Malibu was also included on the written consent form (effectively memorializing

15

ROBINSON's pre-search verbal consent to search the Malibu). ROBINSON was no longer in handcuffs at this time.

39.     At approximately 1:16 p.m., ROBINSON led law enforcement officers to the Robinson Residence and unlocked the back door of the residence with a set of keys he had. Law enforcement officers entered the Robinson Residence and announced their presence. Law enforcement encountered and secured a female inside the residence, who related to law enforcement she was a friend from out of town staying with ROBINSON and that she was traveling home later that evening departing from the O'Hare airport.

40.     At approximately 1:20 p.m., law enforcement conducted a search of the Robinson Residence. Law enforcement officers found a vacuum sealer and multiple roles of vacuum seal bags. Based on my training and experience, these items are common amongst drug traffickers to transport and conceal the odor of narcotics. During the search, in response to a question from law enforcement, ROBINSON indicated that the last time he had narcotics inside the Robinson Residence was on the night that the transaction was supposed to occur with the CS. ROBINSON further indicated that he had approximately one ounce of MDMA at that time, but disposed of it down the toilet and indicated he was in fear of law enforcement.

41.     After law enforcement completed their search of the Robinson Residence, they took Robinson to the Justice Police Department for a post-arrest interview.

42.     At approximately 3:28 p.m., ROBINSON was read his *Miranda* rights, waived them, signed a *Miranda* waiver, and agreed to speak with law enforcement officers. During the ensuing interview, in a non-verbatim summary, ROBINSON indicated to law enforcement that he facilitated a transaction that was set to take place on October 10, 2023, between an individual that he only knew as [the CS's first name] and his friend that he has known for years, Nathan. Law enforcement provided ROBINSON an unmarked photograph of Butler-Ludwig, and ROBINSON positively identified the person in the unmarked photograph as Nathan. ROBINSON further stated that he originally contacted [the CS's first name] on Instagram and retrieved his telephone number to communicate further.

43.     ROBINSON related that [the CS's first name] requested to buy one kilogram of MDMA. ROBINSON explained that on the day of the transaction, October 10, 2023, Nathan arrived at the Robinson Residence with the one kilogram of MDMA, however, the transaction did not occur.

44.     ROBINSON explained that [the CS's first name] had agreed to purchase the kilogram of MDMA for $13,000. Robinson further indicated that he would have received approximately $2,500, if the transaction had occurred.

45.     ROBINSON indicated that he has been selling drugs for approximately one year. Additionally, ROBINSON stated that he had conducted drug transactions with an individual named Individual B. ROBINSON described Individual B as a tall, skinny, white male. ROBINSON explained that he did not know where Individual B lived, but indicated that Individual B traveled between Chicago and New York. Based

17

on my review of law enforcement databases, as well as my conversations with other DEA agents, Individual B is the target of another DEA investigation.

46.     Based on my review of the calls between the CS and ROBINSON, and my participation in the post-arrest interview of ROBINSON, I recognize the voice on the recordings to be that of ROBINSON.

47.     ROBINSON has a criminal history that includes convictions for manufacturer/delivery of ecstasy. Additionally, ROBINSON has prior arrests for drugs, robbery, domestic battery, and other misdemeanors.

## II.     CONCLUSION

48.     Based on the foregoing, I respectfully submit that there is probable cause to believe that, on or about October 10, 2023, WILLIE B. ROBINSON III possessed with intent to distribute a controlled substance, namely, a quantity of a mixture and substance containing a detectable amount of Methylenedioxymethamphetamine, a Schedule I Controlled Substance, and conspired with Nathaniel Lee Butler-Ludwig to possess with intent to distribute and to distribute a controlled substance, namely, a quantity of a mixture and substance containing a detectable amount of Methylenedioxymethamphetamine, a Schedule I

Controlled Substance, in violation of Title 21, United States Code, Section 841(a)(1),

all in violation of Title 21, United States Code, Section 846.

FURTHER AFFIANT SAYETH NOT.

STEPHEN TOVT
Special Agent, Drug Enforcement
Administration


SWORN TO AND AFFIRMED by telephone on October 18, 2023.

Honorable MARIA VALDEZ
United States Magistrate Judge

19